UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROSEANNE THICK,
f/k/a Roseanne LoChiatto,

      Plaintiff,

      v.                                                  6:00-CV-1560-ORL-28C

CHARLES A. BRAY and JOSEPH G. GILLESPIE
d/b/a/ THE PLAZA RESORT & SPA, f/k/s/ HOLIDAY
INN SUNSPREE, BRAY & GILLESPIE, LLC III
d/b/a/ THE PLAZA RESORT & SPA, f/k/a/ HOLIDAY
INN SUNSPREE, a foreign corporation, BRAY &
GILLESPIE, INC., a Florida corporation,
BRAY & GILLESPIE, LLC, a foreign corporation,

      Defendants.
_____/

**DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL BASED
UPON IMPROPER *EX PARTE* COMMUNICATIONS AND FOR A STAY OF
DISCOVERY**

Named Defendants "CHARLES A. BRAY and JOSEPH G. GILLESPIE d/b/a/ THE

PLAZA RESORT & SPA, f/k/s/ HOLIDAY INN SUNSPREE, BRAY & GILLESPIE, LLC III

d/b/a/ THE PLAZA RESORT & SPA, f/k/a/ HOLIDAY INN SUNSPREE, a foreign

corporation, BRAY & GILLESPIE, INC., a Florida corporation, BRAY & GILLESPIE, LLC, a

foreign corporation,"[1] by their undersigned attorneys, hereby file this motion to the Court to

disqualify Plaintiff's counsel. The grounds for this motion are that Plaintiff's counsel has had

improper *ex parte* communications with Defendants' former Regional Vice President and

General Manager, Mr. Bob Jones and former Controller, Ron Wieland, both of whom were

_____

[1] Although not the subject of this instant motion, Plaintiff has improperly named some of the "Defendants," which
either do not exist or were not Plaintiff's employer.

senior level managers and persons whose acts, omissions or statements may be imputed to the corporate Defendants. These communications have severely prejudiced Defendants, thus warranting the disqualification of Plaintiff's counsel. While Defendants believe disqualification is the only appropriate remedy for Plaintiff's counsel's conduct, should this Court not disqualify Plaintiff's counsel, Defendants request an order directing that any statements or affidavits obtained from former employees or agents as a result of, or in connection with such *ex parte* communications be stricken and deemed inadmissible for any purpose during the balance of this matter, including, without limitation, discovery, dispositive motion practice and trial.

Defendants further respectfully request a stay of all discovery pending the outcome of this motion in order to avoid additional prejudice to the Defendants or to Plaintiff, who may be given additional time to find new counsel, should Plaintiff's counsel be disqualified.

## LOCAL RULE 3.01(g) CERTIFICATION

Undersigned counsel certifies, in accordance with Local Rule 3.01(g), that the following efforts have been made to confer with opposing counsel in an effort to discuss and arrive at agreement in connection with the relief requested. On July 13, 2001, the undersigned sent a letter to Plaintiff's counsel, Jeffrey Grant, Esq., asking whether Mr. Grant he or his firm had *ex parte* communications with Mr. Jones or other agents/employees of Defendants and to provide the dates of the conversations, who participated in the conversations and the substance of the conversations. On July 18, 2001, the undersigned sent a second letter requesting this information (Attachment A). Plaintiff's counsel responded in two letters dated July 13, 2001 and July 18, 2001, stating that they would not provide this information (Attachment B). On July 30, 2001, the undersigned had a telephone conference with Mr. Grant to discuss communications Plaintiff's counsel had with Mr. Jones, Mr. Wieland and other present or former employees/agents of

2

Defendants.   Mr. Grant again refused to provide this information, stating that former management and employees of the corporate Defendants were, in his opinion "fair game" who could be contacted by him, as Plaintiff's counsel.

Thereafter, on August 15, 2001, during a telephonic hearing before Magistrate Judge Glazebrook concerning Plaintiff's refusal to provide Defendants with an affidavit from Mr. Jones acknowledged by Plaintiff during her August 15, 2001 deposition, Mr. Grant admitted to this Court and defense counsel that he had a number of *ex parte* conversations and communications with Mr. Jones and had even prepared an Affidavit for him to sign.   On August 16, 2001, the undersigned had a face-to-face meeting with Mr. Grant and tried to resolve this issue.   The undersigned told Mr. Grant that in light of his admissions to the Court concerning his *ex parte* communications, Defendants intended to file a motion to disqualify Plaintiff's firm, or Plaintiff's firm could voluntarily resign as counsel. Plaintiff's counsel declined to voluntarily resign as counsel, necessitating the filing of this Motion.

## STATEMENT OF FACTS

Plaintiff has brought the instant action against Defendants pursuant to Title VII of the Civil Rights Act of 1964, as amended and the Florida Civil Rights Act, alleging that Defendants retaliated against her by terminating her employment when she failed to participate in an alleged investigation relating to discrimination claims by a co-employee (paragraph 67 of Complaint). Defendants unequivocally deny that they retaliated against Plaintiff and further deny that she was terminated.

In or about October, 1998, Plaintiff was hired to act as the Executive Spa Director for a spa to be built at the Plaza Resort & Spa.   At the time of her hiring, no spa yet existed. Defendants were working with architects and contractors in the initial planning phase of the spa.

Plaintiff was hired to amongst other things, hire employees, train employees, prepare pricing for spa treatments, run anticipated profit and loss statements, order supplies, advertise spa services, and take whatever other steps were necessary to guarantee that the spa was in full operating condition for the anticipated grand opening in the Fall of 1999.  The spa did not open in the fall of 1999. On September 9, 1999, following a number of reprimands by Defendants, Plaintiff voluntarily quit her position as Executive Spa Director, with no prior notice.

Plaintiff has alleged that Defendants, through its agent, Bob Jones, the then-Regional Vice President and General Manager of the Plaza Resort & Spa, terminated Plaintiff in retaliation for refusing to sign a statement concerning a former Hotel employee (Jenniffer Monberg).  One of the key issues in this case is whether or not Plaintiff resigned her employment or was terminated on September 9, 1999.

In September, 1999, Mr. Jones was the Regional Vice President and General Manager of the Plaza Resort & Spa, the hotel where the spa was to be located.  At that same time, Ronald Wieland was the Controller for the corporate Defendants.  Mr. Jones and Mr. Wieland are no longer employed by the Defendants[2]. In their respective positions with Defendants, both Messrs. Jones and Wieland were privy to highly confidential information concerning Defendants, including but not limited to, policies and procedures, pricing, marketing, gross revenues, payroll, and highly sensitive and confidential financial information.  Perhaps most importantly, for purposes of the instant motion, both Mr. Jones and Mr. Wieland claim to be have been privy to communications between Defendants and Vincam, the leasing company and co-employer of Defendants, which was responsible for all human resources issues including hiring, firing and reprimands, and played a crucial role concerning the evaluation of Plaintiff's job performance in

August and September, 2001[3] (*see* Wieland Aff. para. V, Attachment C). Although both Mr. Jones and Mr. Wieland had signed Confidentiality Agreements agreeing to, amongst other things, the non-disclosure of trade secrets or confidential information that are unique to the Defendants, it is clear that both have breached their covenants by having *ex parte* communications with Plaintiff's counsel concerning confidential information (Attachment D).

Plaintiff claims that Mr. Jones and Mr. Wieland were central to her alleged termination. Plaintiff claims that Bob Jones terminated her employment; that Ronald Wieland attended the meeting of the alleged termination; and that Mr. Jones and Mr. Wieland were present at meetings where discussions were had with Mr. Charles A. Bray and Vincam concerning the possible termination of Plaintiff prior to September 9, 1999 (*see* Attachments C and E).

Plaintiff's Responses to Interrogatories states that Mr. Jones was told by Charles A. Bray, the President of the Hotel, "on several occasions that they needed to terminate me because of Jenniffer Monberg's Charge of Discrimination" (Pl. Response to Interrogatories, Response to No. 8). In Response to No. 4 of Defendants' Interrogatories, Plaintiff states that Bob Jones "has knowledge of Charles Bray's intent to terminate Plaintiff because of Monberg's Charge of Discrimination" (Attachment F, excerpts).

As noted above, Mr. Wieland was the Controller of the Plaza Resort & Spa, a very sensitive senior management position, whose duties and responsibilities included being the chief accountant in charge of the entire accounting department. According to his affidavit, he was also

---

[2] Mr. Wieland was terminated in the fall of 1999 following allegations of improper and inappropriate sexual harassment and for poor job performance. Mr. Jones was terminated in April, 2001 for poor job performance and the spreading of rumors and confidential information to other employees.

[3] At Mr. Bray's deposition on August 16, 2001, it came to light that Plaintiff had served a subpoena upon Vincam and had obtained documents from Vincam in response to that subpoena concerning this matter. Defendants' counsel never received a copy of the subpoena. Plaintiff's counsel acknowledged at the August 16, 2001 deposition of Mr. Bray, that Plaintiff never produced those documents to Defendants. Indeed, Plaintiff's counsel totally surprised Defendants by showing to Mr. Bray a "Vincam" document at his deposition, a document that had not been produced, despite Defendants' Request for the Production of Documents specifically seeking same. As of the filing of this

privy to confidential communications with Mr. Bray, Mr. Jones, and Vincam concerning Plaintiff

and her job performance and alleged termination (Attachment C).

## B. Plaintiff Failed to Properly Disclose and Produce the Wieland and Jones Affidavits

Neither the Wieland nor Jones Affidavits were produced to Defendants despite the

following request in Defendants' Request for Production of Documents dated March 19, 2001, in

which the following was requested: " No. 34.  Copy of all Affidavits of witnesses or witness

statements concerning the allegations raised in YOUR COMPLAINT."

Instead, each Affidavit was only discovered through Plaintiff's deposition testimony on

July 12 and August 15, 2001.  Plaintiff testified at her deposition on July12, 2001, that there

existed an affidavit of Ron Wieland concerning information he had regarding Ms. Thick and her

lawsuit.  Such document had not been produced to Defendants' counsel as of July 12, 2001.

Indeed, when Defendants' counsel told Plaintiff's counsel that such document had not been

produced, Plaintiff's counsel argued that it had not been produced because it was "attorney work

product" (Thick Tr. 56, Attachment G).  Plaintiff's counsel subsequently changed his mind and

produced the September 12, 2000 Wieland affidavit in late July, 2001.

At the continuation of Plaintiff's deposition on Wednesday, August 15, 2001[4] Plaintiff

testified that her counsel had obtained an Affidavit from Mr. Jones in connection with this case[5].

Defendants insisted Plaintiff's counsel immediately produce the Affidavit.  However, Plaintiff's

---

motion, despite oral and written requests for the production of the Vincam documents, Plaintiff has not produced any to Defendants.

[4] At Plaintiff's July 12, 2001 deposition, she claimed to have become suddenly "ill," and the deposition was stopped. It was later continued to August 15, 2001, resulting in additional costs and attorneys' fees to Defendants.

[5] The deposition transcript of Plaintiff from her August 15, 2001 has not been transcribed.

[6] Despite Defendants' Request for the Production of Documents, asking for a "log" of all documents claimed to be privileged because of attorney-client privilege or work-product privilege, no such log was ever produced.

counsel insisted that it was "work-product", and therefore, not discoverable.[6]  At approximately 5:00 p.m. on August 15, 2001, Defendants made an emergency motion to the Court for production of the Jones Affidavit in light of the fact that Plaintiff was scheduled to take Mr. Bray's deposition on the very next day, August 16, 2001, but had refused to produce this critical document.  The Court granted Defendants' motion and the document was produced at Mr. Bray's deposition (Jones Aff., Attachment E).  During the telephonic hearing with the Court, Mr. Grant admitted that he had a number of *ex parte* telephone conversations and communications with Mr. Jones, culminating in his preparation of the Jones Affidavit.

This pattern of failing to disclose requested documentation was once again evidenced toward the very end of Mr. Bray's deposition on August 16, 2001.  Mr. Bray was shown a document purportedly prepared by Vincam, the leasing company and co-employer of Plaintiff in 1999. The document concerned performance problems with Plaintiff.  When Defendants' counsel objected to this document on the grounds that it had not been produced to Defendants, Plaintiff's counsel said Vincam had provided documents to Plaintiff in response to a subpoena.  Neither the subpoena nor the "Vincam" documents were produced to Defendants by Plaintiff despite requests for same.  As of the date of the filing of this motion, the "Vincam" documents still have not been produced by Plaintiff despite an additional written request to Plaintiff's counsel on August 17, 2001.

## C. Sequence of Events Concerning Ex *Parte* Communications

1.  Plaintiff's counsel knew that Defendants were represented by counsel as early as May 19, 2000.  On that date, Mr. Jeffrey Grant sent the undersigned a letter enclosing a "courtesy copy of Ms. Thick's Charge of Discrimination" against Defendants (Attachment H).

2.  At her deposition on July 12, 2001, Plaintiff testified that she knew that Mr. Jones and her attorneys were attempting to contact each other (Thick Tr. 120, Attachment G), but could not recall whether they did or not.

3.  Ron Wieland submitted an affidavit in letter form to Plaintiff's counsel in September 12, 2000 concerning Plaintiff's employment with Defendants. This document clearly indicates that Plaintiff's counsel had *ex parte* communications with Mr. Wieland (Attachment C). This document was not produced to Defendants until the end of July, 2001, and only after Defendants insisted that it be produced and was not "work product," as claimed by Plaintiff.

4.  At the continuation of Plaintiff's deposition on Wednesday, August 15, 2001, Plaintiff testified that her counsel had obtained an Affidavit from Mr. Jones in connection with this case. During a telephonic hearing with Magistrate Judge Glazebrook on August 15, 2001 concerning the production of the Jones Affidavit, Plaintiff's counsel admitted that he had a number of telephone conversations and communications with Mr. Jones, culminating in his preparation of the Jones Affidavit.

5.  As discussed above, Plaintiff's counsel has taken the position that Mr. Jones and Mr. Wieland and any other former employees of the corporate Defendants are "fair game" and that *ex parte* communications with key managerial agents/employees are not improper.

## ARGUMENT

### I.   PLAINTIFF'S COUNSEL SHOULD BE DISQUALIFIED FOR THEIR IMPROPER *EX PARTE* COMMUNICATIONS WITH DEFENDANTS' FORMER MANAGEMENT

The professional conduct of all members of the Bar of this Court is governed by the model rules of professional conduct of the American Bar Association as modified and adopted

8

by the Supreme Court of Florida.  U.S. Dist. Ct., M.D. Fla. Loc. R. 2.04(c).  The Florida Supreme Court has ruled that attorneys must avoid even an appearance of professional impropriety and that under appropriate circumstances, it requires prompt remedial action from the court.  State Farm Mutual Auto Co. v. K.A.W., 575 So. 2d 630, 633  (Fla. 1991).

The issue on this motion is whether Plaintiff's counsel had improper communications with former senior level management agent/employees, whose actions and statements concerning Plaintiff could bind the corporate Defendants under Title VII of the Civil Rights Act of 1964, as amended.  It has been determined that a former employee may be considered a "party" for purposes of Model Rule 4.2.  See Rentclub v. Transamerica Rental Finance Corp. 811 F. Supp. 651, 657 (M.D. Fla. 1992).

Rule 4.2 of the American Bar Association, Model Rules of Professional Conduct states that[7]

> "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the same matter..."

The comment to the Rule further states that:

> "In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having managerial responsibility on behalf of the organization and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."

In Rentclub, Inc. v. Transamerica Rental Finance Corp., 811 F. Supp. 651 (M.D. Fla. 1992), aff'd, 43 F. 3d 1439 (11th Cir. 1995), the Court held that an organizational

---

[7] The Florida Rule of Professional Conduct 4-4.2 is identical except the Florida Rule states: "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the same matter..."

"party" is defined as including: (1) managerial employees, (2) any other person whose acts or omissions in connection with the matter at issue may be imputed to the corporation for liability, and (3) persons whose statements constitute admissions by the corporation. *Id.* at 657, *citing* to <u>Polycast Technology Corp. v. Uniroyal, Inc.</u>, 129 F.R.D. 621, 626 (S.D.N.Y. 1990).

The Court in <u>Rentclub</u> granted the motion to disqualify defendant's counsel because of *ex parte* communications with a former employee who was a high ranking officer in a key position at the time of the events in issue, and who had possession of confidential, privileged information relevant to the issues involved in the lawsuit and had also retained his services to act as a consultant in the case. *Id.* at 655. The Court held that former employees are included under the definition of an organizational "party" as "any other person whose acts or omission in connection with the matter at issue may be imputed to the corporation for liability." *Id.* at 657. The Court further held that the focus should be on whether the former employee's statements could be admissions against the corporation or whether their actions could be imputed to the corporation and if so, that the communication should be barred to prevent disclosure of any privileged information. *Id.* The Court also noted:

> Privileged communications present a distinct problem with respect to contact with former employees, thus ex parte contact should be barred to prevent disclosure of any inadvertent confidential communications...The interest of the corporation in protecting privileged information acquired by an employee during the course of employment from disclosure to an opponent in litigation remains after the employee leaves the corporation. *Id.*

The <u>Rentclub</u> Court applied the "Norton Test"[8] for disqualification of counsel. The "Norton Test" has two prongs: first "although no proof of actual wrongdoing is required, there must exist a reasonable possibility that some specifically identifiable impropriety in fact occurred. Second, the likelihood of public suspicion must outweigh the social interest that will be served by counsel's continued participation." *Id.* at 654.

While Defendants acknowledge the Florida Supreme Court case of <u>H.B.A. Management, Inc. v. The Estate of May Schwartz</u>, 693 So. 2d 541, 542 (Fla. 1997), those facts are distinguishable from the present case because the plaintiff in <u>H.B.A. Management, Inc.</u> did not bring an action for discrimination or retaliation under Title VII of the Civil Rights Act, where agency principles are applied to impose liability on a corporation. Second, that court premised its decision upon its conclusion of law that former employees can no longer speak for or bind the organization. *Id.* at 544. As discussed below, the United States Supreme Court has held that the acts of former management agents/employees may bind the corporation in Title VII cases. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 780 (1998). Similarly, as noted in <u>Rentclub</u>, the fact that an individual is now a former employee does "not alter the relation or connection with defendant, or its potential civil liability. As Magic's purported chief financial officer, Canales was privy to confidential and proprietary information and had access to confidential business documents belonging to TRFC and Magic." <u>Rentclub</u>, *supra* 811 F. Supp. at 658, *citing* to <u>Porter v. Arco Metal</u>, 642 F. Supp. 1116, 1118 (D.Mont. 1988)("Rule 4.2 has been held to bar *ex parte* contact with former employees who, while employed, had 'managerial responsibilities' concerning the matter in litigation").

---

[8] In <u>Norton v. Tallahassee Memorial Hospital</u>, 689 F.2d 938, 941 (11th Cir. 1982), the Eleventh Circuit adopted a two-prong test for disqualification under Canon 9 (which prohibited the appearance of professional impropriety under the former operative Florida Rules of Professional Responsibility).

This Court should adopt the reasoning from the Middle District's decision in the <u>Rentclub</u> case, namely, that *ex parte* communications with a former high level agent/employee are improper where, as here, those agents/employees' statements or actions concerning the alleged illegal conduct can ultimately be imputed to the corporation. The prohibition against *ex parte* communications with former key level management agents/employees is particularly compelling in a Title VII action. The critical issue in this case is whether Plaintiff was or was not terminated by Mr. Jones in retaliation for claimed protected conduct. The acts of Mr. Jones, whether or not even authorized by Defendants and co-employer Vincam, may, under Title VII agency principles, bind the Defendants (and surely Plaintiff will argue that the acts of Defendants' agents, including Mr. Jones, will serve to bind Defendants). For example, in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 780 (1998), the Supreme Court of the United States held "that an employer is vicariously liable for actionable discrimination caused by a supervisor". The Court further stated:

> We further agree with Faragher that in implementing Title VII it makes sense to hold an employer vicariously liable for some tortuous conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219 (2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here. *Id.* at 802.

Furthermore, in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 754, 756 (1998), the Supreme Court looked to agency law and concluded that the term "employer" as defined under Title VII includes "agents" and that an employer may be liable for both negligent and intentional torts committed by an employee within the scope of their employment. The Court relied "on general common law of agency, rather than on the law of any particular State, to give meaning to these terms." *Id.* Also the Court cited to Section 219(1) of the Restatement, which set out a principal of agency law that "[a] master is subject to liability for the torts of his servants

committed while acting in the scope of their employment." *Id.* at 756. "The law now imposes liability where the employee's purpose, however misguided, is wholly or in part to further the master's business." *Id.*

Rule 801(d)(2)(D) of the Federal Rules of Evidence provides further reason to prohibit *ex parte* communications with a former key management agent/employee. The Rule provides that a statement by an agent or servant of a party is admissible against the party if it concerns a matter within the scope of the agency or employment and is made during the existence of the agency or employment relationship. Thus, Plaintiff's counsel, through *ex parte* communications could uncover all sorts of confidential information and communications between Mr. Jones, Ms. Limauro, Mr. Bray and Vincam, and use such information at trial to bind the company and hold it liable for the acts of Mr. Jones. That result clearly gives Plaintiff an unfair advantage, while prejudicing Defendants' entire case.

Most troubling about Plaintiff's counsel's present legal position is the fact that they now call former employees "fair game" while taking a different position in an article written by Bernard H. Dempsey of Dempsey & Sasso in the Florida Bar Journal article *"New Developments in the Law Ex Parte Communications with Current and Former Employees of a Corporate Defendant"* 71 Fla. Bar J. 10 (December, 1997). Dempsey & Sasso acknowledge that the Court in <u>Rentclub</u> stated "that a corporation retains an interest in protecting privileged information acquired by an employee from disclosure to an opponent even after the employee leaves the corporation. Thus, even though a former employee may lack the necessary agency relationship required to make statements admissible against the corporation, the relation or connection of the employee to the corporation's potential civil liability may be so close as to require, in all fairness, that the adversary's *ex parte* contacts be prohibited." *Id.* at 17. Furthermore, the Dempsey & Sasso article asserts that the former employee will remain a "party" because the

employee has a memory and the corporation still has a crucial interest in the former employee's knowledge. *Id.* at 18. Lastly, the Dempsey & Sasso article cautions that the issue of *ex parte* communications in federal court is "unsettled" and states that "the prudent lawyer will proceed on a case-by-case basis and govern himself or herself according to which particular judge is presiding over the case." *Id.* at 20.

### A. *Ex Parte* Communications with Mr. Jones

In the instant action, there is no doubt that the first prong of the "Norton" test has been met. Plaintiff's counsel knew that Mr. Jones was the Regional Vice President and General Manager of the Plaza Resort & Spa; Plaintiff's counsel knew that Plaintiff was alleging that it was Mr. Jones who terminated her; Plaintiff's counsel knew that the corporate Defendants were represented by attorneys Saady & Saxe P.A. at the time of the *ex parte* communications; and Plaintiff is taking the legal position that, as Regional Vice President and General Manager, Mr. Jones had authority to hire and fire employees and that his statements and actions should serve to bind the corporate Defendants. Further, Mr. Jones' Affidavit (drafted by Plaintiff's counsel) leaves no doubt that confidential information was disclosed to Plaintiff's counsel. In addition, the Affidavit clearly states that Mr. Jones and Mr. Bray engaged in conversations concerning Plaintiff which are clearly confidential to the corporate Defendants: "Bray would frequently tell me that they need to get rid of Thick because she knew too much about Monberg and that whole situation" (Jones Aff., para. 6, Attachment E). There were many confidential communications between Mr. Jones, Mr. Bray, Ms. Nancy Limaruo (Acting Head of Human Resources) and Vincam concerning Plaintiff and her job performance. The confidential nature of those communications cannot be lost and should not be exposed to *ex parte* communications with Plaintiff's counsel simply because Mr. Jones is no longer associated with the corporate Defendants. The issue is not whether Mr. Jones is presently associated with the corporate

14

Defendants, but whether his former actions can bind the corporate Defendants at the time of trial. The corporate Defendants have an ongoing interest in protecting its former agents' knowledge of confidential information.

Thus, Plaintiff's counsel should be disqualified based on the fact that counsel has gained access to an adversary party's privileged communications, thereby gaining an informational advantage. Carnival Corp. and/or Carnival Cruise Lines, Inc. v. Romero, 710 So. 2d 690 (Fla. 5th DCA 1998).

The second prong of the Norton test is also satisfied because the likelihood of public suspicion outweighs the social interest that would be served by Plaintiff's current counsel's continued participation in this case. The likelihood of public suspicion resulting from Plaintiff's counsel's communication with Mr. Jones, a key managerial agent and witness in this case, outweighs the social interest that will be served by Dempsey & Sasso's continued participation as counsel. This case is still in the early discovery stages and Plaintiff has only taken the deposition of one Defense witness, Mr. Bray on August 16, 2001. No further depositions have been scheduled. Trial is not scheduled until May 1, 2002.

In granting the motion to disqualify counsel for improper conduct, the Rentclub Court cited to MMR/Wallace Power & Industrial, Inc. v. Thames and Associates, et al., 764 F. Supp. 712 (D. Conn. 1991), which held that "the presumption - - that confidential information was received creates at least an appearance that defendant has obtained an unfair advantage at trial - - taints the judicial proceedings so as to warrant disqualification." Rentclub, supra 811 F. Supp. at 657. See also Kliener v. First National Bank, 751 F.2d 1193 (11th Cir. 1985)("the court can order disqualification of counsel . . . where there is at least a reasonable possibility that some specifically identifiable impropriety did occur and where court finds that the likelihood of public

suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case").

## B. *Ex Parte* Communications with Mr. Wieland

Plaintiff's counsel also had improper *ex parte* communications with Mr. Wieland, the corporate Controller during the events in issue in 1999. Mr. Wieland states in his September, 2000 affidavit to Plaintiff's counsel that he has personal knowledge of the events that transpired regarding Plaintiff's employment because he was witness to or "was told directly by the Resort's owner, Mr. Charles A. Bray" that: "In mid-September, at the end of the suspension period, Ms. LoChiatto was called into the Regional Vice President and General Manager's office and informed that she was terminated from her position"; that he "was an attendee at this meeting"; "It was made very clear that she was terminated by Mr. Bob Jones, the Regional Vice President and General Manager." " (Attachment C).  Most importantly, Mr. Wieland alleges "There were several phone calls made by the Regional Vice President and General Manager (Mr. Jones) and the Personnel Director (Ms. Limauro), to the Human Resources/Payroll Company (Vincam) which we had recently contracted with to provide services to the Resort, about Ms. LoChiatto's termination.  I was in the office when some of these calls were made.  The summary of the conversations were how to terminate Ms. LoChiatto with no liability to the resort" (*Id.*). Plaintiff's counsel's *ex parte* communication with Mr. Wieland warrants disqualification because Mr. Wieland's personal knowledge of the facts pertains to the critical issue in this case of whether Plaintiff resigned or was fired.

The first prong of the Norton test is satisfied with regard to *ex parte* communications with Mr. Wieland because Plaintiff's counsel knew Mr. Wieland was employed as Defendants' Controller in 1999.  Furthermore, Plaintiff's counsel knew that the corporate Defendants were represented by Saady & Saxe at the time it had the improper communications with Mr. Wieland.

16

Mr. Wieland's position as Controller, coupled with his alleged knowledge of the facts of this case could arguably lead a court to conclude that his acts, omissions and statements should be imputed to or bind the corporate Defendants. In addition, Mr. Wieland's affidavit to Dempsey & Sasso dated September 12, 2000 shows communications between Mr. Grant's office and Mr. Wieland. These facts show that an identifiable impropriety occurred between Plaintiff's counsel and Mr. Wieland.

Like Mr. Jones, the second prong of the Norton test (the court must find that the likelihood of public suspicion outweighs the social interest that would be served by a lawyer's continued participation in this case) is self-evident. The likelihood of public suspicion resulting from Plaintiff's counsel's communication with Mr. Wieland, an employee who claims to have knowledge about a crucial issue in this case and whose statements could be imputed to the Company, outweighs the social interest that will be served by Dempsey & Sasso's continued participation as counsel. Rentclub, *supra* 811 F. Supp. at 656-657.

The reason behind prohibiting *ex parte* communications with present or former employees under certain circumstances is stated in United States of America and State of Florida v. Eckerd Corp., 35 F. Supp. 2d 896 (M.D. Fla. 1999). Although the Eckerd case dealt with the issue of *ex parte* communications with current employees, the case is instructive on agency principles of law. In that case, the court ruled that even though pharmacy technicians and clerks did not hold managerial positions with Eckerd, they still fell within Rule 4-4.2 because their statements could constitute admissions on the part of the organization. The pharmacists had knowledge of Eckerd's practices in regards to filling patient prescriptions, which was the crucial issue in the case. The court stated that Rule 4-4.2 applies if there is a "substantial likelihood" that the statements obtained during the *ex parte* interviews may be used in a later proceeding

17

against the organization. The court also reasoned that since the pharmacists could verify Eckerd's practices, their statements could be imputed to or bind the corporation.

## CONCLUSION

Dempsey & Sasso should be disqualified as Plaintiff's counsel because of improper *ex parte* communications with Mr. Jones and Mr. Wieland, and perhaps others not presently known to Defendants. As senior managers/agents of the corporate Defendants, both Mr. Jones and Mr. Wieland have represented that they have information and knowledge concerning Plaintiff's employment and the events of September 9, 1999, which statements could be imputed to the corporate Defendants. Plaintiff's counsel's *ex parte* communications were an inappropriate attempt to elicit statements from these agents/employees and to gain an unfair advantage at trial. Indeed, Mr. Grant boldly told the undersigned that these individuals were "fair game." Such tactics are unethical and prejudicial to Defendants' defense of this case. For the reasons stated above, Dempsey & Sasso should be disqualified from representing the Plaintiff in this case and should be ordered to have no further contact with any of the Defendants, their agents or employees, current or former.

WHEREFORE, Defendants respectfully request that the Court grant their motion and disqualify Dempsey & Sasso as counsel in this lawsuit and order that they have no further contact with the Defendants, and that all affidavits, letters, statements and other documents improperly obtained by Dempsey & Sasso from present and former employees/agents, be stricken and barred from any use in these proceedings. In the alternative, should this Court not disqualify Plaintiff's counsel, it is requested that this Court grant an order prohibiting Plaintiff's counsel from engaging in any *ex parte* communications with Defendants' present or former employees/agents, and that all affidavits, letters, statements and other documents improperly

18

obtained by Dempsey & Sasso from present and former employees/agents, be stricken and barred from any use in these proceedings.

It is further requested that this Court grant a stay of all discovery, including but not limited to depositions, document demands, interrogatories, and expert reports pending the outcome of this motion, in order to avoid additional prejudice to the Defendants or to Plaintiff, who may be given additional time to find new counsel, should Plaintiff's counsel be disqualified.

It is further requested that Plaintiff's counsel be required to pay to Defendants all reasonable costs and attorney's fees in connection with the making of this motion.

Dated:  August 21, 2001

SAADY & SAXE, P.A.

Claire Saady
Fla. Bar No. 0102954
205 Crystal Grove Blvd.
Lutz, Florida 33548
813-909-8855

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the attached was served via telefax and first-class mail upon Plaintiff's counsel on this 21st day of August, 2001:

Dempsey & Sasso
390 N. Orange Avenue, Ste. 2700
Orlando, Florida 32801-1673
Fax (407) 422-8556

Claire Saady

20

# ATTACHMENT A

# SAADY & SAXE, P.A.

### Attorneys at Law
205 Crystal Grove Boulevard
Lutz, Florida 33548

(813) 909-8855
Fax: (813) 909-8844
e-mail: saadyandsaxe@saadyandsaxe.com

Claire Saady
Admitted in Fla. and N.Y.

July 13, 2001

**VIA TELEFAX**
Jeffrey K. Grant, Esq.
Dempsey & Sasso
Bank of America Centre, Suite 2700
390 N. Orange Ave.
Orlando, FL 32801-1643

RE: **THICK v. THE PLAZA RESORT & SPA**
Our File: 599-1

Dear Mr. Grant:

Based upon the answers given by Ms. Thick at her deposition on July 12, 2001 and telephone conversations I had with Mr. Robert Jones in 2000, it appears that you and/or other attorneys at your firm have had improper *ex parte* communications with Mr. Jones and other managerial employees of Defendants. Such communications are improper and unethical. Please advise me in writing as to whether or not you or others on your firm's behalf engaged in communications with Mr. Jones or other employees of my client, past or present. Specifically, please advise of (a) the dates of the conversations; (b) those participating in the conversations; and (c) the substance of those conversations. Please respond in writing no later than July 18, 2001.

Very truly yours,

Claire Saady

CS/gj

cc:   Mr. Charles Bray

# SAADY & SAXE, P.A.

### Attorneys at Law
205 Crystal Grove Boulevard
Lutz, Florida 33548

(813) 909-8855
Fax: (813) 909-8844
e-mail: saadyandsaxe@saadyandsaxe.com

Claire Saady
Admitted in Fla. and N.Y.

July 18, 2001

**VIA TELEFAX**
Jeffrey K. Grant, Esq.
Dempsey & Sasso
Bank of America Centre, Suite 2700
390 N. Orange Ave.
Orlando, FL 32801-1643

### RE:  **THICK v. THE PLAZA RESORT & SPA**
Our File:  599-1

Dear Mr. Grant:

I am in receipt of your letter dated July 13, 2001.  Despite my request that you provide me with a list of all communications had between your office and any present and/or former employees of the Defendants, you failed to do so.  Once again, please advise of (a) the dates of the conversations/communications; (b) those participating; and (c) the substance of those conversations/communications no later than July 20, 2001.

Very truly yours,

Claire Saady

CS/hj

cc: Mr. Charles A. Bray

# ATTACHMENT B

# DEMPSEY & SASSO

ATTORNEYS AT LAW

BANK OF AMERICA CENTER
SUITE 2700
390 N. ORANGE AVE.
ORLANDO, FLORIDA 32801-1643
(407) 422-5166
TELEFAX (407) 422-8556

POST OFFICE BOX 1980
ORLANDO, FLORIDA 32802-1980

July 13, 2001

**VIA FACSIMILE & U.S. MAIL**

Claire Saady, Esquire
Saady & Saxe, P.A.
205 Crystal Grove Boulevard
Lutz, Florida  33549

> Re:  *Thick vs. Charles A. Bray and Joseph G. Gillespie*
> *d/b/a The Plaza Resort and Spa, et. al.*
> <u>Case Number: 6:00-CV-1560-ORL-28C</u>

Dear Ms. Saady:

I have your letter dated July 13, 2001; however, I have no idea how you can make an accusation that Dempsey & Sasso had any improper *ex parte* communications with Bob Jones. I suggest you educate yourself on the law of *ex parte* communications prior to making such accusations. A good starting point for you would be Mr. Dempsey's December 1997 article in *The Florida Bar Journal* titled, "*Ex Parte* Communications with Current and Former Employees of a Corporate Defendant."

Sincerely,

Jeffrey K. Grant

JKG/bjs

# DEMPSEY & SASSO

### ATTORNEYS AT LAW

BANK OF AMERICA CENTER
SUITE 2700
390 N. ORANGE AVE.
ORLANDO, FLORIDA 32801-1643
(407) 422-5166
TELEFAX (407) 422-8556

POST OFFICE BOX 1980
ORLANDO, FLORIDA 32802-1980

July 18, 2001

**VIA FACSIMILE & U.S. MAIL**

Claire Saady, Esquire
Saady & Saxe, P.A.
205 Crystal Grove Boulevard
Lutz, Florida 33549

Re: *Thick vs. Charles A. Bray and Joseph G. Gillespie*
*d/b/a The Plaza Resort and Spa, et. al.*
Case Number: 6:00-CV-1560-ORL-28C

Dear Ms. Saady:

I have your letter dated July 18, 2001, with regard to communications with unidentified witnesses. We are unaware of any legal obligation to disclose the information you seek. If you want to try to provide us with some sort of justification for your requests, please feel free to do so. Absent authority to the contrary, Dempsey & Sasso will not provide Defendants with the information you have "requested" in your July 13 and July 18 letters.

Sincerely,

Jeffrey K. Grant

JKG/bjs
cc:   Ms. Roseanne Thick

ATTACHMENT C

Ronald L. Wieland
1515 Hough Street
Ft. Myers, FL  33901


September 12, 2000


Demsey & Sasso, P.A.
390 N. Orange Avenue
Orlando, FL  32081

RE: Roseanne LoChiatto


Dear Ladies or Gentlemen:

With regard to the above case, in my position as Controller of the Plaza Resort & Spa, during the month of September 1999, I was a eye-witness to events which transpired regarding Ms. LoChiatto's employment and termination with the Plaza Resort.  Specifically, I was a witness to, or was told directly by the Resort's owner, Mr. Charles A. Bray, the following:

I)      Ms. LoChiatto was a salaried management employee of the Resort.

II)     In early September, Ms. LoChiatto was suspended for nine days and told not to come to the property.  I had no direct knowledge of why.

III)    In mid-September, at the end of the suspension period, Ms. LoChiatto was called into the General Manager's office and informed that she was terminated from her position.  I was an attendee at this meeting.  It was made very clear that she was terminated by Mr. Bob Jones, the General Manager.  Ms. LoChiatto never made any reference to herself voluntary quitting her position.

IV)    Several days later, Mr. Bob Jones, his Secretary, and myself drove to Ms. LoChiatto's home to deliver her final payroll check.  His Secretary and I went into Ms. LoChiatto's home where we delivered her paycheck and had her sign a statement that she had received it.

V)     There were several phone calls made by the General Manager and the Personnel Director, to the Human Resources / Payroll Company which we had recently contracted with to provide services to the Resort, about Ms. LoChiatto's termination.  I was in the office when some of these calls were made.  The summary of the conversations were how to terminate Ms. LoChiatto with no liability to the Resort.


There are certainly facts of this situation which I do not remember one year later, but the main allegation is true, that Ms. LoChiatto was terminated by the Resort and did not resign.  Please contact me if I may clarify or expand on anything else that I know of this situration.


*June J. Dean (signature)*

JUNE J. DEAN

CC 759917

9/12/00

Sincerely yours,

*Ronald L. Wieland (signature)*

Ronald L. Wieland

ATTACHMENT D

## CONFIDENTIALITY AGREEMENT
## FOR THE REVIEW OF INFORMATION

This CONFIDENTIALITY AGREEMENT FOR THE REVIEW OF INFORMATION (The "Agreement") is made and agreed to by the person designated as the Employee on the signature page hereof (the "Employee").

### PREAMBLE

Bray & Gillespie, Inc., d.b.a. OCEANS RESORTS, A Family of Fine Hotels (hereinafter referred to as "Employer") on a daily and consistent basis as a function of its business, has in its possession or has access to both written and verbal (the "Material") concerning business affairs of both Employer and its clients and related third parties. In connection therewith Employee has access to said Material to review and inspect documents, files, contracts, and other information relating to the Material (the Confidential information") as a function of his or her employment by Employer. The Confidential Information includes documentation and information that is confidential and/or proprietary in nature. Therefore, Employer has determined to require Employee to execute and deliver this Agreement as a condition of its employment with Employer. The Employee agrees as follows:

### AGREEMENT

**Section 1.** _Purpose._ The Employee agrees that its review and inspection of the Confidential Information shall be solely used for purposes relating to his or her employment with employer and not be used by employee as an agent, representative, or employee of any third party. Furthermore, because of the confidential information gained under its employment with the Employer, the Employee agrees not to seek, or work with or for, a similar type of business within a twenty-mile radius without the expressed written consent of Employer.

**Section 2.** _Non-Disclosure and Use of Confidential Information._
(a)The Employee agrees that all confidential information shall be used by the Employee solely for the purpose stated in Section 1 hereof. The Employee further agrees not to disclose any of the Confidential Information without the prior written consent of Employer unless the Confidential Information is requested by a court of appropriate jurisdiction and stated to be required in connection with a civil action which has been filed with said court.

(b) In the event Employee fails in a respect to comply with its obligations under this Agreement, the Employee shall be liable to Employer for breach of this Agreement. In addition, Employer may in its discretion seek to enjoin such action.

(c) The rights, powers, and remedies provided for in the preceding subsection (b) shall be in addition to and do not preclude the exercise of any other right, power, or remedy available to Employer under law or in equity. No forbearance, failure, or delay in exercising any such right, power, or remedy shall operate as a waiver or preclude its further exercise.

**Section 3.** _Duplication._ The Employee agrees to refrain from making any reproduction of any item of Confidential Information without the prior written consent of the Employer.

**Section 4.** _Entire Agreement._ This Agreement represents the entire agreement between the Employee and Employer related to the treatment of Confidential Information heretofore or hereafter reviewed or inspected by the Employee. This Agreement supersedes all other agreements relating to such matters which have previously been executed by the Employee in favor of the Employer.

IN WITNESS WHEREOF, The Employee and Employer have executed this Agreement as of the date(s) set forth below.

**EMPLOYEE SIGNATURE:** _____
Printed Name: _____   Date: _6-1-99_

**EMPLOYER: Bray & Gillespie, Inc. d.b.a. OCEANS RESORTS, A Family of Fine Hotels.**

By: _Charles A. Bray_
Title: **PRESIDENT**
Printed Name: **Charles A. Bray**   Date: _12-30-99_
WITNESS: _Nancy Hamilton_
Printed Name: _Nancy Hamilton_   Date: _3-16-0_

## CONFIDENTIALITY AGREEMENT AND COVENANT NOT-TO-COMPETE

This Agreement is made this 3 day of April , 2001 by and between Bray &

Gillespie, LLC, III dba, The Plaza Resort & Spa (the "Company"), with its principal place of

business located at 600 N. Atlantic Avenue, Daytona Beach, Florida 32118 and

Robert E. Jones ("Employee"), residing in the state of Florida.

### *BACKGROUND*

The Company is a luxury resort and spa and has developed and owns valuable and

proprietary information related to the Business as defined in Sections 1 and 2, all of which are

trade secrets, confidential and propriety to the Company. Employee desires to learn the trade

secrets and confidential information of the Company and during his/her employment will have

access to and become familiar with various confidential information and trade secrets. In

consideration of Employee's employment and/or continued employment with the Company,

he/she agrees to be bound by the terms of this Agreement. This Agreement shall supersede and

make null and void any former trade secret/confidentiality agreement signed by Employee.

Employee further understands and agrees that this Agreement does not in any way alter his/her

at-will employment status with the Company.

### I. Unauthorized Disclosure

The Employee, during the term of employment under this Agreement, will have

access to and become familiar with various trade secrets and confidential information, meaning

information disclosed to the Employee or known by the Employee as a consequence of or

through his/her employment by the Company including but not limited to information relating

research, development, inventions, designs, training, purchasing, billing, accounting, marketing,

merchandising, and selling techniques that are unique and that are owned by the Company and

that are regularly used in the operation of the Company's business. During the period of

employment with the Company and for five (5) years following the expiration of such

1

employment, whether by termination or resignation, Employee agrees that he/she will not, without the written consent of the Company, disclose to any person, other than employees of the Company or a person to whom disclosure is reasonably necessary or appropriate in connection with the performance by the Employee of his/her duties hereunder, any confidential information or trade secrets obtained by Employee while in the employ of the Company. All files, records, documents, equipment, computer programs, and similar items relating to the business of the Company, whether prepared by the Employee or otherwise coming into the Employee's possession, shall remain the exclusive property of the Company and shall not be disclosed or removed from the premises of the Company under any circumstances whatsoever without the prior written consent of the Company.

In addition, both during Employee's employment and following the termination of Employee's employment whether terminated by Employee or by The Company, Employee shall not disclose in any way confidential information and trade secrets of The Company, and shall not remove from the custody of The Company any documents, lists, records, or copies, facsimiles, computer disks, tapes or printouts, printouts of e-mail or other written or electronically-reproduced information in connection with or pertaining to The Company's business. In addition, at the expiration of Employee's employment, Employee agrees to deliver to The Company any such information in his/her possession and to return any and all other property belonging to The Company.

## II. Trade Secrets and Confidential Information

The Employee recognizes and acknowledges that all information defined herein as "trade secrets" and "confidential" and including, but not limited to, the following is a valuable, special and unique asset of the Employer's business:

1)   Customer lists.

2

2)  Computer and software installation and support techniques

3)  Supplier lists.

4)  Price lists.

5)  Marketing lists.

6)  Confidential or secret processes, methods, formulas, equipment, computer programs, flow charts, diagrams, documentation, or other material of the Company, with respect to any confidential or secret development or research work or pricing or marketing procedures of the Company or with respect to any other confidential or secret aspect of the business of the Company

All such information remains the property of the Company. The Employee, except as required in his/her duties to The Company, hereby covenants and agrees that he/she will never, directly or indirectly, during his/her employment or after termination thereafter use, disseminate, disclose, lecture on, or in any manner publish any trade secret and confidential information without the Company's written permission. Nor shall the Employee dispose of, or delete from any computer system any documents belonging to the Company.

### III. Non-Competition and Non-Solicitation During Term of Employment.

During Employee's employment with The Company, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual of representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of the The Company.

Nor shall the Employee directly or indirectly engage in the solicitation of current clients, or prospective clients of the Company for the personal gain of the Employee Nor shall the Employee directly or indirectly solicit any employee or independent contractor of The Company to leave The Company's employ.

3

## IV.  Post-Employment Noncompetition and Non-Solicitation

As consideration for the Employee's employment and/or continued employment by The Company, and because Employee will gain specialized knowledge and experience and will establish personal relationships with the Company's customers, suppliers, and other employees, Employee agrees that for a period of six (6) months following the last day of such employment with The Company, whether by termination or resignation, or otherwise and within the geographic area of the Orange, Osceola, Volusia, Flagler, Putnam, and St. Johns Counties, Employee shall not:

(a)    Directly or indirectly, own, manage, operate, control, be employed by, consult for, be an agent to, hire or solicit persons for hire, participate in or be connected or associated with in any manner the ownership, management, operations, business, or development of any business which is engaged in the same business as The Company.  This covenant shall be construed as an agreement independent of any other provision of this Agreement.  The existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant.

(b)    Directly or indirectly, approach, contact, solicit, request, sell to or deal with any customer, client, or prospective customer of The Company, or any subsidiary or affiliate of The Company, for the purpose of offering or selling products or services to, or otherwise obtaining or receiving business or income from, or otherwise diverting from The Company business or income from such customers, clients or prospective customers of The Company in connection with the business of The Company, or for the purpose of defaming the Company.

(c)    The term "customer or client of The Company" shall mean any individual or business firm who or which was or is a customer or client of The Company, or whose business was solicited by The Company at any time during Employee's employment with The Company, regardless of whether such customer or client was generated in whole or in party by Employee's efforts.  The term "prospective customer" of The Company shall mean any individual or

4

business firm who has been contacted by any employee, agent, or principal of The Company in connection with its business and services.

(d)   The Employee further agrees not to solicit the Company's employees or independent contractors to leave the employ of the Company.

(e)   Employee agrees that these provisions are necessary and reasonable to protect the legitimate business interests of The Company in protecting its trade secrets; valuable confidential business and professional information; substantial relationships with specific prospective or existing customers or clients; and/or customer or client goodwill. Employee acknowledges that the restricted period of time and geographical area specified above are reasonable, in view of the nature of the business in which The Company is engaged and Employee's knowledge of such business. Notwithstanding anything herein to the contrary, if the period of time or the geographical area specified above should be determined to be unreasonable in a judicial proceeding, then the period of time and territory of the restriction shall be reduced so that this Agreement may be enforced in such area and during such period of time as shall be determined to be reasonable.

### V. Condition of Employment

The provisions contained in the foregoing paragraphs, with reference to disclosure of trade secrets or confidential information of the Company, shall be considered conditions of employment of the Company.

### VI. Breach of Agreement

In the event of a breach or threatened breach by the Employee of the provisions contained herein, the Company shall be entitled to an injunction restraining the Employee from disclosing, in whole or in part, any trade secret and confidential information, whether referred to specifically herein or not, or from rendering services to any person, firm, or corporation, association, partnership, or other entity to whom such information has been disclosed, or is threatened to be disclosed, whether such person or entity is, at the time of such disclosure, a competitor of The Company or not.

5

Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach against either the Employee or any other person or entity, including the recovery of damages.

## VII. Legal Relief

In the event Employee breaches or threatens to commit a breach of any of these provisions; The Company shall have the following rights and remedies, each of which shall be independent of the other and severally enforceable:

(a)     The right to compel specific performance of the covenants, through provisional remedies or otherwise, by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the covenants would cause irreparable injury to The Company, or its subsidiaries or affiliates, if any, and that money damages would not provide an adequate remedy to The Company. The Company shall be entitled to recover from Employee its costs and reasonable attorneys' fees incurred in obtaining such relief.

(b)     The right to an accounting from Employee requiring Employee to account for any pay over to, The Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Employee, his/her partner, new company, new employer, either directly or indirectly, as a result of any transactions constituting a breach of the covenants.

(c)     Any other legally-enforceable right to seek and obtain money damages for breach of the covenants available under the applicable law. The Company shall be entitled to recover from Employee its costs and reasonable attorneys' fees incurred in obtaining such relief.

## VIII.  Term

As used herein, the term of this Agreement continues until Employee's employment with The Company or its successor is terminated for any reason, either by Employee or The Company, or its successor, if applicable. This Agreement shall survive the merger, sale,

6

purchase. acquisition by or of The Company, and shall apply with equal force and effect to such successors.

## IX. Governing Law

The rights and obligations of the parties under this Agreement shall be governed by the laws of the State of Florida, and any actions commenced concerning this Agreement shall be brought in a court of competent jurisdiction in Volusia County, Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

THE COMPANY

By: Charles A. Bray, President

EMPLOYEE'S NAME - PRINT

4/3/200__

EMPLOYEE'S SIGNATURE/DATE

7

## CONFIDENTIALITY AGREEMENT
## FOR THE REVIEW OF INFORMATION

THIS CONFIDENTIALITY AGREEMENT FOR THE REVIEW OF INFORMATION (The "Agreement") is made and agreed to by the person designated as the Employee on the signature page hereof (the "Employee").

### PREAMBLE

Bray & Gillespie, Inc, (hereinafter referred to as "Employer") on a daily and consistent basis as a function of its business, has in its possession or has access to both written and verbal (the "Material") concerning business affairs of both Employer and its clients and related third parties. In connection therewith Employee has access to said Material to review and inspect documents, files, contracts, and other information relating to the Material (the "Confidential Information") as a function of his or her employment by Employer. The Confidential Information includes documentation and information that is confidential and/or proprietary in nature. Therefore, Employer has determined to require Employee to execute and deliver this Agreement as a condition of its employment with Employer.

The Employee agrees as follows:

### AGREEMENT

Section 1. Purpose. The Employee agrees that its review and inspection of the Confidential Information shall be solely used for purposes relating to his or her employment with employer and not be used by Employee as an agent, representative, or employee of any third party. Furthermore, because of the confidential information gained under its employment with the Employer, the Employee agrees not to seek or work with or for a similar type business within a twenty mile radius without the expressed written consent of Employer.

Section 2. Non-Disclosure and Use of Confidential Information.

(a)  The Employee agrees that all Confidential Information shall be used by the Employee solely for the purpose stated in Section 1 hereof. The Employee further agrees not to disclose any of the Confidential Information without the prior written consent of Employer unless the Confidential Information is requested by a court of appropriate jurisdiction and stated to be required in connection with a civil action which has been filed with said court.

(b) In the event the Employee fails in any respect to comply with its obligations under this Agreement, the Employee shall be liable to Employer for breach of this Agreement. In addition, Employer may in its discretion seek to enjoin such action.

(c) The rights, powers, and remedies provided for in the preceding subsection (b) shall be in addition to and do not preclude the exercise of any other right, power, or remedy available to Employer under law or in equity. No forbearance, failure, or delay in exercising any such right, power, or remedy shall operate as a waiver or preclude its further exercise.

Section 3      Duplication. The Employee agrees to refrain from making any reproduction of any item of Confidential Information without the prior written consent of the Employer.

Section 4.      Entire Agreement. This Agreement represents the entire agreement between the Employee and Employer related to the treatment of Confidential Information heretofore or hereafter reviewed or inspected by the Employee. This Agreement supersedes all other agreements relating to such matters which have previously been executed by the Employee in favor of the Employer.

IN WITNESS WHEREOF, the Employee and Employer have executed this Agreement as of the date(s) set for the below.

EMPLOYEE: _Ronald L. Wigand_

Printed Name: _Ronald Wigand_

Date: _3-8-99_

EMPLOYER: Bray & Gillespie, Inc, 600 N. Atlantic, Daytona Beach, FL.

By: _Charles A. Bray_

Title: PRESIDENT

Printed Name: Charles A. Bray

Date: _1/26/99_

WITNESS: _Virginia R. Urban_

Printed Name: _VIRGINIA R. URBAN_

Date: _3-9-99_

ATTACHMENT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROSEANNE THICK f/k/a ROSEANNE
LoCHIATTO,

       Plaintiff,

vs.                         CASE NO.: 6:00-cv-1560-Orl-28C

CHARLES A. BRAY and JOSEPH G.
GILLESPIE d/b/a THE PLAZA RESORT &
SPA, f/k/a HOLIDAY INN SUNSPREE,
BRAY & GILLESPIE, LLC III d/b/a THE
PLAZA RESORT & SPA, f/k/a HOLIDAY
INN SUNSPREE, a foreign corporation,
BRAY & GILLESPIE, INC., a Florida
corporation, and BRAY & GILLESPIE, LLC,
a foreign corporation,

       Defendants.

_____/

## AFFIDAVIT OF ROBERT JONES

STATE OF FLORIDA

COUNTY OF DADE

    BEFORE ME, the undersigned authority, this day personally appeared ROBERT

JONES, who, after first being duly sworn, upon his oath, deposes and says:

    1.    That I am over the age of eighteen (18) years and I am competent to make

this Affidavit.

2.     Beginning on approximately June 1, 1999, I became the Vice President of Operations and Manager of the Plaza Resort and Spa (the "Hotel").

3.     Because of my position as Vice President of Operations, I had the opportunity to work with and observe the actions of the Hotel's President, Charles Bray. Based on my experiences at the Hotel and working for Mr. Bray, I am aware that Mr. Bray had a reputation for being untruthful and manipulative.

4.     Because of my position as Vice President of Operations, I had the opportunity to work with and observe the actions of Roseanne Thick (f/k/a Roseanne LoChiatto), who was the Executive Spa Director at the Hotel.

5.     At some point in 1999, I became aware that Roseanne Thick's daughter, Jenniffer Monberg, had filed a Charge of sexual harassment against Bray and the Hotel.

6.     In this regard Bray would frequently tell me that they needed to get rid of Thick because she knew too much about Monberg and that whole situation.

7.     During some time in early September 1999, I was presented with over twenty (20) written memos and/or reprimands directed to Roseanne Thick for my signature. I was instructed to sign off on the memos and/or reprimands. At the time I signed off on the memos and/or reprimands, I was not comfortable doing that; however, I did not want to jeopardize my own employment.

8.     At the time that Ms. Thick was presented with the memos and/or reprimands, I knew that she was a very honest and sincere person and that she had done an excellent job in her position as Executive Spa Director. Mr. Bray simply wanted Roseanne Thick out of the Hotel and he directed others to take whatever steps were necessary to ensure that

-2-

Ms. Thick would leave the employment of the Hotel with sufficient written documentation that Bray believed would exonerate his and the Hotel's actions.

9.     I was present on September 9, 1999, at a meeting which ultimately resulted in Roseanne Thick's separation of employment from the Hotel. Ms. Thick did not resign her position as Executive Spa Director.  During the meeting on September 9, 1999, I made it clear to Ms. Thick that she was terminated as an employee of the Hotel.

10.     I feel deeply sorry for what Roseanne Thick was put through by Charles Bray and I am ashamed that I was part of the whole situation.  Roseanne Thick did not deserve to be terminated from her employment with the Hotel.  Roseanne Thick was one of the hardest working and best employees that I had seen at the Hotel.

FURTHER AFFIANT SAITH NAUGHT

ROBERT JONES

STATE OF FLORIDA

COUNTY OF DADE

BEFORE ME, the undersigned authority this __10__ day of __August__, 2001, personally appeared ROBERT JONES, who is personally known to me or who has produced _____ as identification and who did/did not take an oath.

(SEAL)

NOTARY PUBLIC

(Type or Print Name of Notary)
MY COMMISSION # CC 766515

E:\CASES\Thick (LoChiaso)\Pleadings\Affidavit of Robert Jones.wpd

-5-

ATTACHMENT F



received
8-9-01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROSEANNE THICK f/k/a ROSEANNE
LoCHIATTO,

        Plaintiff,

vs.

                              CASE NO.: 6:00-cv-1560-Orl-28C

CHARLES A. BRAY and JOSEPH G.
GILLESPIE d/b/a THE PLAZA RESORT &
SPA, f/k/a HOLIDAY INN SUNSPREE,
BRAY & GILLESPIE, LLC III d/b/a THE
PLAZA RESORT & SPA, f/k/a HOLIDAY
INN SUNSPREE, a foreign corporation,
BRAY & GILLESPIE, INC., a Florida
corporation, and BRAY & GILLESPIE, LLC,
a foreign corporation,

        Defendants.

_____/

## NOTICE OF SERVING ANSWERS
## TO DEFENDANT'S FIRST SET OF INTERROGATORIES

      Plaintiff, ROSEANNE THICK, by and through her undersigned attorneys, hereby

serves the attached Answers to Defendants CHARLES A. BRAY and JOSEPH G.

GILLESPIE d/b/a THE PLAZA RESORT & SPA, f/k/a HOLIDAY INN SUNSPREE,

BRAY & GILLESPIE, LLC III d/b/a THE PLAZA RESORT & SPA, f/k/a HOLIDAY INN

SUNSPREE, BRAY & GILLESPIE, INC., and BRAY & GILLESPIE, LLC's First Set of

Interrogatories.

8.     If you have heard or know about any written or oral statement or remark made by any person concerning and/or that supports your allegations asserted in this lawsuit, please identify the name, address, phone number, and the job position of each person who made the statement(s); each person who was present when the statement(s) were made; the date, time, place where each statement(s) were made; the substance of each statement; and all documents that refer to each statement.

## RESPONSE:

The following are a number of the statements that I am presently aware of which support the allegations asserted in this lawsuit:

a.     Charles Bray told me that he would probably be advised by his attorneys to let me go and offer me a settlement due to Jenniffer Monberg's Charge of Discrimination.

b.     Charles Bray told Bob Jones on several occasions that they needed to terminate me because of Jenniffer Monberg's Charge of Discrimination.

c.     Ron Weiland's sworn statement dated September 12, 2001.

d.     Charles Bray made statements to Erica Blanchard to the effect that she should closely observe my job functions as I would not be employed much longer.

e.     Charles Bray made numerous statements to me to the effect that I was his best employee.

f.     Nancy Limauro stated to me that it was "wrong" how Defendants treated and terminated me.

g.     Nancy Limauro told Jim Brittan that she was told that I had to be fired.

h.     Eddie Schuler told me that he was instructed by Mr. Bray to write a statement regarding me and was also instructed to write other things which he did not.

-13-

4.      Identify each person (name, address, phone number, employer, and job position) who is believed or known by you, your agents, or attorneys to have:

   (a)     knowledge concerning any of the allegations or issues in this lawsuit, and provide a description of the subject matter and facts about which the person has knowledge or is believed to have knowledge;

   (b)     knowledge about or possession of or control of any documents, as broadly defined in these interrogatories pertaining to any fact or issue involved in this lawsuit and describe as to each, the item(s) each person has, the name, address and phone number of the person who took or prepared the item(s), and the date the item(s) was prepared; and/or

   (c)     discussed the allegations or issues of this lawsuit with you.

**<u>RESPONSE:</u>**

The following consists of persons who I presently believe may have knowledge concerning issues relating to this lawsuit. As discovery is ongoing, there may exist others who have knowledge of issues relating to this lawsuit:

   A.      Roseanne Thick
           80 Bosarby Drive
           Ormond Beach, FL 32174
           Has knowledge of allegations in Verified Complaint.

   B.      Ray Thick
           80 Bosarby Drive
           Ormond Beach, FL 32174
           Husband of Plaintiff with knowledge of Plaintiff's qualifications and emotional impact of retaliatory treatment.

   C.      Charles A. Bray
           Has knowledge of retaliatory treatment of Plaintiff. Has knowledge of Defendants' operations, policies, and procedures in general.

   D.      Michael Gillespie
           Has knowledge of the work performed by Plaintiff while employed by Defendant.

   E.      Joseph Gillespie
           Has knowledge of Defendants' operations, policies, and procedures in general.

F.   Bob Jones
     (954) 797-9452
     Has knowledge of Plaintiff's qualifications and performance and
     termination.  Also has knowledge of Charles Bray's intent to terminate
     Plaintiff because of Monberg's Charge of Discrimination.

G.   Ron Weiland
     1515 Hough Street
     Ft. Myers, FL 33901
     Has knowledge of matters contained in his sworn statement dated September
     12, 2001.

H.   Randy Jacob
     Has knowledge of Plaintiff's work while employed by Defendants.

I.   Michael LoChiatto
     Has knowledge of work done by Plaintiff for Defendant prior to being
     employed by Defendant; i.e., drawings and designs for the spa.

J.   Nancy Limauro
     Has knowledge of the events surrounding Plaintiff's suspension and
     termination.

K.   Steve Penland
     Has knowledge of the events surrounding Plaintiff's suspension and
     termination.

L.   Marisol Moreno
     Has knowledge of the events surrounding Plaintiff's suspension and
     termination.

M.   Jim Brittan
     Has knowledge of the work done by Plaintiff while employed by Defendants.

N.   Eddie Schuler
     Has knowledge of the work done by Plaintiff while employed by Defendants.

O.   Jenniffer Monberg
     (386) 615-1212
     444 Druid Circle
     Ormond Beach, FL
     Has knowledge of the work done by Plaintiff while employed by Defendants.

# ATTACHMENT G

1      Q    Okay.  Was Ron Weiland physically present when --

2      A    Yes.

3      Q    He was?

4      A    Yeah.  It happened right after Ron Weiland said it

5    wasn't true.  That's when...

6      Q    When's the last time you spoke to Ron Weiland?

7      A    Maybe a couple months ago.

8      Q    Has he written a statement for you?

9      A    Yes, he has.

10      Q    He has?

11      A    Yes.

12      Q    Did you give that to your attorney?

13      A    Yes, I did.

14           MS. SAADY:  I don't have a copy of that.

15           MR. GRANT:  It's work product.

16           MS. SAADY:  Excuse me?

17           MR. GRANT:  Work product.

18           MS. SAADY:  A statement written by Ron Weiland is

19    work product?

20           MR. GRANT:  Right.

21           MS. SAADY:  Not if he wrote it, it's not.  That is

22    not work product if he wrote it.

23    BY MS. SAADY:

24      Q    Did you actually see the statement that Ron

25    Weiland wrote?

1      Jones, drafted it, or Bob Jones drafted it?

2          A      When I first asked Mr. Jones for the letter, he

3      said that he would get back to me, because he had to get

4      Jackie to type it up for him.   That's all I know.

5          Q      Do you know whether or not your attorney has

6      spoken to Mr. Jones?

7          A      I'm not -- I'm not sure if he spoke to him, but I

8      know that they were trying to get in touch with each other.

9          Q      How do you know that?

10             MR. GRANT:   Objection, attorney/client.

11     BY MS. SAADY:

12         Q      Not to the extent you know it outside of

13     conversations with your attorney.   Well, strike that.

14             Did Mr. Jones ever tell you that he and your

15     attorney were trying to get in touch with each other?

16         A      Mr. Jones asked me to have my attorney get in

17     touch with him.

18         Q      Did Mr. Jones ever tell you whether or not he and

19     your attorney, Mr. Grant, ever spoke to each other?

20         A      Whether or not they did?

21         Q      (Nods head.)

22         A      He told me they kept missing each other's calls.

23         Q      Have you asked Mr. Jones to be a witness in this

24     trial?

25         A      No.


VOLUSIA REPORTING COMPANY

ATTACHMENT H

# DEMPSEY & SASSO
### ATTORNEYS AT LAW

BANK OF AMERICA CENTER
SUITE 2700
390 N. ORANGE AVE.
ORLANDO, FLORIDA 32801-1673
(407) 422-5166
TELEFAX (407) 422-8556

POST OFFICE 1980
ORLANDO, FLORIDA 32802-1980

May 19, 2000

Claire Saady, Esq.
Saady & Saxe, P.A.
14502 N. Dale Mabry Boulevard, Suite 2000
Tampa, FL 33618

Sent via Facsimile and U.S. Mail
813-909-8844

Re: LoChiatto vs. Plaza Resort and Spa

Dear Ms. Saady:

Please find enclosed a courtesy copy of Ms. LoChiatto's Charge of Discrimination, which has been filed today with the Equal Employment Opportunity Commission and the Florida Human Relations Commission. Should you have any questions, please feel free to contact me.

Very truly yours,

Jeffrey K. Grant

JKG:cal
Enclosures